## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| GLOBALFOUNDRIES U.S. INC. | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. _____ |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| XILINX, INC. and | ) | |
| MOUSER ELECTRONICS, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## COMPLAINT

Plaintiff Globalfoundries U.S. Inc. ("Globalfoundries" or "Plaintiff") brings this patent infringement action against Defendants Xilinx, Inc. ("Xilinx") and Mouser Electronics, Inc. ("Mouser") (collectively, "Defendants") as follows:

## NATURE OF THE ACTION

1.      This is a civil action for infringement of United States Patent Nos. 8,581,348 ("'348 patent"), 9,355,910 ("'910 patent"), 7,425,497 ("'497 patent"), 8,598,633 ("'633 patent"), 6,518,167 ("'167 patent"), and 8,039,966 ("'966 patent") (collectively, the "Asserted Patents") under the patent laws of the United States, 35 U.S.C. § 1 *et seq*.

## THE PARTIES

2.      Plaintiff Globalfoundries U.S. Inc. is a Delaware corporation with its principal place of business at 2600 Great America Way, Santa Clara, California 95054.

1

3.      Defendant Xilinx, Inc. is a Delaware corporation with its principal place of business at 2100 Logic Drive, San Jose, California 95124.

4.      Defendant Mouser Electronics, Inc. is a Delaware corporation with its principal place of business at 1000 North Main Street, Mansfield, Texas 76063.

## JURISDICTION AND VENUE

5.      The Court has subject matter jurisdiction over these claims under 28 U.S.C. §§ 1331 and 1338(a) and the patent laws of the United States, 35 U.S.C. § 1 *et seq.*

6.      The Court has personal jurisdiction over Defendant Xilinx consistent with the requirements of the Due Process Clause of the United States Constitution and the Delaware Long Arm Statute.   Xilinx is incorporated in Delaware.   On information and belief, Xilinx has regularly and systematically transacted business in Delaware, directly or through subsidiaries or intermediaries, and/or committed acts of patent infringement in Delaware as alleged more particularly below.   Xilinx has also placed integrated circuits using Taiwan Semiconductor Manufacturing Company Ltd. ("TSMC") 28 nanometer and smaller technology[1] and products containing these integrated circuits, including Xilinx's field programmable gate arrays, including 3D ICs ("FPGAs"), adaptive compute acceleration platforms ("ACAPs"), and systems on a chip,

---

[1] TSMC 28 nanometer and smaller technology includes TSMC's 28 nanometer technology (including TSMC's High-k Metal Gate gate-last technology and high-performance compact technology) ("28 Nanometer"), TSMC's 22 nanometer technology (including TSMC's 22 nanometer ultra-low power, 22 nanometer ultra-low leakage, and 22 nanometer ultra-low leakage static random access memory technologies) ("22 Nanometer"), TSMC's 20 nanometer technology ("20 Nanometer"), TSMC's 16/12 nanometer technology (including TSMC's 16 nanometer Fin Field Effect Transistor ("FinFET") process, 16 nanometer FinFET Plus process, 16 nanometer FinFET Compact Technology, and 12 nanometer FinFET Compact Technology) ("16 Nanometer"), TSMC's 10 nanometer technology (including TSMC's 10 nanometer FinFET process) ("10 Nanometer"), TSMC's 7 nanometer technology (including TSMC's 7 nanometer FinFET process) ("7 Nanometer").  Globalfoundries reserves the right to accuse any forthcoming TSMC technology, such as TSMC's 7 nanometer extreme ultraviolet lithography technology and TSMC's 5 nanometer technology.

including MPSoCs and RFSoCs ("SoCs") manufactured using TSMC's 28 nanometer and smaller technology (the "Accused Products") into the stream of commerce by shipping Accused Products into Delaware, shipping Accused Products knowing that those products would be shipped into Delaware, and/or shipping Accused Products knowing that these Accused Products would be incorporated into other Accused Products that would be shipped into Delaware. Xilinx also interacts with customers who sell the Accused Products into Delaware, knowing that these customers will sell the Accused Products into Delaware, either directly or through intermediaries. The Court therefore has both general and specific personal jurisdiction over Xilinx.

7.      The Court has personal jurisdiction over Defendant Mouser consistent with the requirements of the Due Process Clause of the United States Constitution and the Delaware Long Arm Statute. Mouser is incorporated in Delaware. On information and belief, Mouser has regularly and systematically transacted business in Delaware, directly or through subsidiaries or intermediaries, and/or committed acts of patent infringement in Delaware as alleged more particularly below. Mouser has also placed Accused Products into the stream of commerce by shipping Accused Products into Delaware. The Court therefore has both general and specific personal jurisdiction over Mouser.

8.      With respect to Defendant Xilinx, venue is proper in this district under 28 U.S.C. § 1400(b) because Xilinx resides in this district.

9.      With respect to Defendant Mouser, venue is proper in this district under 28 U.S.C. § 1400(b) because Mouser resides in this district.

**JOINDER**

10.      Joinder of Defendants is proper under 35 U.S.C. § 299. The allegations of patent infringement contained herein arise out of the same series of transactions or occurrences relating

to the importing into the United States and/or making, using, selling, or offering for sale within the United States, the same Accused Products, including Xilinx's field programmable gate arrays, including 3D ICs ("FPGAs"), adaptive compute acceleration platforms ("ACAPs"), and systems on a chip, including MPSoCs and RFSoCs ("SoCs") manufactured using TSMC's 28 nanometer and smaller technology.

11.    Common questions of fact relating to Defendants' infringement will arise in this action.  For example, common questions of fact concerning Xilinx's and Mouser's infringement of the '348, '910, '497, '633, '167, and '966 patents will arise in this action.  Additionally, common questions of fact as to profits and revenues derived by Xilinx and Mouser will arise, as well as common questions of fact related to Globalfoundries' damages for the same.  On information and belief, common questions of fact will also exist with regard to Xilinx's and Mouser's defenses in this litigation, if any.

## FACTUAL BACKGROUND

12.    Globalfoundries is a U.S. company with manufacturing facilities that use and develop some of the world's most advanced semiconductor devices available today.  Building on IBM's world-class semiconductor technology heritage, Globalfoundries, the acquirer of IBM's semiconductor division, has been accredited as a Category 1A Microelectronics Trusted Source for fabrication, design, and testing of microelectronics by the U.S. Department of Defense (DOD).[2]  Globalfoundries' East Fishkill, New York facility is currently the most advanced Trusted Foundry, and as such is the only facility of its kind that can provide certain advanced circuits to satisfy the DOD's requirements.  As the second-largest foundry in the world and the only advanced Trusted Foundry, Globalfoundries is uniquely equipped to efficiently and quickly

---

[2] "Aerospace and Defense," https://www.globalfoundries.com/market-solutions/aerospace-and-defense.

meet the DOD's advanced and highly classified manufacturing and production needs—and is also equipped to do the same for its private-sector clients.

13.     Globalfoundries is the most advanced pure-play foundry in the U.S. and Europe, and employs thousands of people in the U.S. and worldwide.  While other companies were abandoning semiconductor manufacturing in the U.S., Globalfoundries bucked this trend by investing billions of dollars on advanced technology and research in the United States. Globalfoundries originated from another leading U.S. semiconductor company, Advanced Micro Devices' semiconductor manufacturing arm in 2009 and expanded globally through acquisition and organic investment.  Its largest expenditure by far is its $15 billion organic U.S. investment in its leading-edge, 300 acre facility known as Fab 8 in Malta, New York.  Globalfoundries broke ground for that state of the art facility in 2009 and produces leading edge technology from that location to customers worldwide.  A major U.S. acquisition took place in 2015 when Globalfoundries acquired IBM's microelectronics facilities and personnel in Burlington, Vermont and East Fishkill, New York—facilities that became Fab 9 and Fab 10, respectively. Globalfoundries acquired not just IBM's facilities and personnel, but also the fruits of IBM's decades of industry-leading investment in U.S. semiconductor fabrication capacity and technology.  Specifically, Globalfoundries obtained 16,000 IBM patents and applications (including the '497 and '966 patents asserted in this action); numerous world-class technologists; decades of experience and expertise in semiconductor development, device expertise, design, and manufacturing; and an expanded manufacturing footprint.  The acquisition cemented

Globalfoundries' role as a global leader in world-class semiconductor manufacturing and advanced process technologies.[3]

14.    Globalfoundries' U.S. manufacturing facilities in Burlington, Vermont; East Fishkill, New York; and Malta, New York use and develop some of the most advanced process nodes and differentiated technologies (inclusive of its 12/14nm FinFET, RF and Silicon Photonics technology solutions) available today.  Fab 8 is a leading fabrication facility for advanced manufacturing in the U.S., with 40,875 square meters of cleanroom space and continued expansion, and over 3,000 total employees as of June 2019.  The current capital investment for the Fab 8 campus stands at more than $15 billion, making Fab 8 the largest public-private sector industrial investment in New York State's history.  The significance of this investment and its importance to advanced manufacturing in the U.S. have been recognized by top government officials, including by the President of the U.S. during a 2012 visit to New York hosted in part by Globalfoundries.[4]

15.    Globalfoundries' investment from the Champlain Valley through the Hudson Valley makes it the spine of the Northeast's Tech Valley.  Three out of Globalfoundries' five fabs are in the U.S., but investment does not stop at its manufacturing capacity. Globalfoundries' manufacturing footprint is supported by facilities for research, development, sales, and design enablement located near hubs of semiconductor activity, including in Santa Clara, California; Dallas, Texas; Austin, Texas; Rochester, Minnesota; Endicott, New York; and

---

[3]    "Globalfoundries   Completes   Acquisition   of   IBM   Microelectronics   Business," https://www.globalfoundries.com/news-events/press-releases/globalfoundries-completes-acquisition-of-ibm-microelectronics-business.

[4]    "Globalfoundries   Welcomes   President   Barack   Obama   to   NY's   Capital   Region," https://blog.globalfoundries.com/globalfoundries-welcomes-president-barack-obama-to-nys-capital-region/.

Raleigh, North Carolina. Of its 16,000 employees worldwide, approximately 7,200 are employed in the U.S.

16.     However, the manufacturer of the Xilinx products accused of infringing in this action, TSMC, has taken a different approach and has decided to simply use Globalfoundries' patented inventions without payment or permission. TSMC is a competing semiconductor foundry with manufacturing facilities located primarily in Hsinchu, Taiwan. TSMC has recently expressed an interest in building a new manufacturing facility in the U.S., but has not reported any tangible steps towards implementing its ostensible interest. In contrast, TSMC completed building the most advanced manufacturing facility of its kind in mainland China last year. By bringing advanced 16nm FinFet to China, TSMC has positioned itself to benefit further from the shift in global supply chains out of the U.S. and Europe into Greater China. TSMC develops, manufactures, imports, and sells for importation into the U.S. semiconductor devices, including to the Defendants. But TSMC does these things on the back of Globalfoundries, using Globalfoundries' patented technologies to make its products. Indeed, although its infringing chips have flooded the U.S. market, it appears that TSMC has attempted to avoid being subject to patent infringement allegations in the U.S. through creative legal and tax structuring. As set forth below, the Accused Products incorporate, without any license from Globalfoundries, many technologies developed by Globalfoundries and protected by patents owned by Globalfoundries. TSMC's, and/or its customers', importation of infringing articles into the U.S. from Greater China and elsewhere abroad directly harms Globalfoundries and its billions in U.S. investments in manufacturing. Globalfoundries respectfully seeks relief from this Court for Defendants' infringement.

## THE ASSERTED PATENTS

17.     The '348 patent is entitled "Semiconductor device with transistor local interconnects," and issued on November 12, 2013, to inventors Mahbub Rashed, Steven Soss, Jongwook Kye, Irene Y. Lin, James Benjamin Gullette, Chinh Nguyen, Jeff Kim, Marc Tarabbia, Yuansheng Ma, Yunfei Deng, Rod Augur, Seung-Hyun Rhee, Scott Johnson, Subramani Kengeri, and Suresh Venkatesan.  Globalfoundries owns the entire right, title, and interest in and to the '348 patent.  A copy of the '348 patent is attached to this Complaint as Exhibit A.

18.     The '910 patent is entitled "Semiconductor device with transistor local interconnects," and issued on May 31, 2016 to inventors Mahbub Rashed, Irene Y. Lin, Steven Soss, Jeff Kim, Chinh Nguyen, Marc Tarabbia, Scott Johnson, Subramani Kengeri, and Suresh Venkatesan.  Globalfoundries owns the entire right, title, and interest in and to the '910 patent. A copy of the '910 patent is attached to this Complaint as Exhibit B.

19.     The '497 patent is entitled "Introduction of metal impurity to change workfunction of conductive electrodes," and issued on September 16, 2008 to inventors Michael P. Chudzik, Bruce B. Doris, Supratik Guha, Rajarao Jammy, Vijay Narayanan, Vamsi K. Paruchuri, Yun Y. Wang, and Keith Kwong Hon Wong.  Globalfoundries owns the entire right, title, and interest in and to the '497 patent.  A copy of the '497 patent is attached to this Complaint as Exhibit C.

20.     The '633 patent is entitled "Semiconductor device having contact layer providing electrical connections," and issued on December 3, 2013 to inventors Marc Tarabbia, James B. Gullette, Mahbub Rashed, David S. Doman, Irene Y. Lin, Ingolf Lorenz, Larry Ho, Chinh Nguyen, Jeff Kim, Jongwook Kye, Yuansheng Ma, Yunfel Deng, Rod Augur, Seung-Hyun Rhee, Jason E. Stephens, Scott Johnson, Subramani Kengeri, and Suresh Venkatesan.

8

Globalfoundries owns the entire right, title, and interest in and to the '633 patent. A copy of the '633 patent is attached to this Complaint as Exhibit D.

21.     The '167 patent is entitled "Method of forming a metal or metal nitride interface layer between silicon nitride and copper," and issued on February 11, 2003 to inventors Lu You, Matthew S. Buynoski, Paul R. Besser, Jeremias D. Romero, Pin-Chin Connie Wang, and Minh Q. Tran. Globalfoundries owns the entire right, title, and interest in and to the '167 patent. A copy of the '167 patent is attached to this Complaint as Exhibit E.

22.     The '966 patent is entitled "Structures of and methods and tools for forming in-situ metallic/dielectric caps for interconnects," and issued on October 18, 2011 to inventors Chih-Chao Yang and Chao-Kun Hu. Globalfoundries owns the entire right, title, and interest in and to the '966 patent. A copy of the '966 patent is attached to this Complaint as Exhibit F.

## CLAIMS FOR PATENT INFRINGEMENT

23.     The allegations provided below are exemplary and without prejudice to Globalfoundries' infringement contentions. In providing these allegations, Globalfoundries does not convey or imply any particular claim constructions or the precise scope of the claims. Globalfoundries' claim construction contentions regarding the meaning and scope of the claim terms will be provided under the Court's scheduling order and local rules.

24.     As detailed below, each element of at least one claim of each of the Asserted Patents is literally present in the Accused Products, or is literally practiced by the process through which each of the Accused Products is made. To the extent that any element is not literally present or practiced, each such element is present or practiced under the doctrine of equivalents.

## COUNT I
## INFRINGEMENT OF THE '348 PATENT

25.     Globalfoundries incorporates by reference the allegations set forth in paragraphs 1 through 24 as though fully set forth herein.

26.     On information and belief, Xilinx has directly infringed and continues to infringe and/or has induced infringement of one or more claims of the '348 patent, including at least claim 1, literally or under the doctrine of equivalents, by importing into the United States, and/or using, and/or selling, and/or offering to sell in the United States without authority or license, integrated circuits manufactured by TSMC using, for example, TSMC's 16 Nanometer technology and products containing these integrated circuits (collectively, the "'348 Accused Products"), in violation of 35 U.S.C. § 271.  The '348 Accused Products include at least field programmable gate arrays, including 3D ICs ("FPGAs"), adaptive compute acceleration platforms ("ACAPs"), and systems on a chip, including MPSoCs and RFSoCs ("SoCs"), such as the Xilinx XCKU3P and XCKU15P families of FPGAs, and other Kintex UltraScale+ FPGAs, fabricated using, for example, TSMC's 16 Nanometer process.

27.     On information and belief, Xilinx has directly infringed and continues to infringe one or more claims of the '348 patent, including at least claim 1, literally or under the doctrine of equivalents, by importing into the United States, and/or using, and/or selling, and/or offering to sell in the United States, without authority or license, '348 Accused Products, in violation of 35 U.S.C. § 271(a).  On information and belief, Xilinx imports '348 Accused Products into the United States for sales and distribution to customers located in the United States.  On information and belief, Xilinx sells the '348 Accused Products in the United States.  For example, Xilinx provides direct sales through at least its bare die program and sells directly to original equipment manufacturers and electronic manufacturing service providers.  On

information and belief, these direct sales include sales of '348 Accused Products in the United States.  On information and belief, Xilinx offers the '348 Accused Products for sale in the United States.  For example, Xilinx engages in sales, marketing, and contracting activity in the United States and/or with United States offices of its customers.   In particular, Xilinx has sales representatives in at least 47 states and sales offices throughout the United States.

28.     The '348 Accused Products meet all the limitations of at least claim 1 of the '348 patent.   Specifically, claim 1 of the '348 patent claims a semiconductor device comprising: a semiconductor substrate; a first transistor and a second transistor formed on said semiconductor substrate; each of said transistors comprising a source, a drain, and a gate; a CA layer electrically connected to at least one of said source or said drain of said first transistor; and a CB layer electrically connected to both of said gates of said transistors and said CA layer.

29.     The '348 Accused Products are semiconductor devices.  Each is an integrated circuit fabricated using, for example, TSMC's 16 Nanometer semiconductor process.

30.     The '348 Accused Products have a semiconductor substrate.  Each is an integrated circuit fabricated using, for example, TSMC's 16 Nanometer semiconductor process such that the circuit's structures are fabricated on top of a semiconductor substrate.

31.     The '348 Accused Products have a first transistor and a second transistor formed on said semiconductor substrate.  Each is an integrated circuit fabricated using, for example, TSMC's 16 Nanometer semiconductor process such that at least two transistors are formed on the semiconductor substrate.

32.     In the '348 Accused Products, each of the said transistors comprise a source, a drain, and a gate.  Each is an integrated circuit fabricated using, for example, TSMC's 16

Nanometer semiconductor process such that at least two transistors are formed on the semiconductor substrate, where each transistor has a source, a drain, and a gate.

33.     The '348 Accused Products have a CA layer electrically connected to at least one of said source or said drain of said first transistor.  Each includes, for example, SRAM cells made up of multiple transistors.  The SRAM cells are fabricated with a local interconnect layer that electrically connects to either the source or drain of a first transistor.

34.     The '348 Accused Products have a CB layer electrically connected to both of said gates of said transistors and said CA layer.  Each includes, for example, SRAM cells made up of multiple transistors.  The SRAM cells are fabricated with a local interconnect layer that electrically connects the gate of the first transistor, the gate of the second transistor, and another local interconnect layer.

35.     On information and belief, Xilinx actively, knowingly, and intentionally induces infringement of one or more claims of the '348 patent under 35 U.S.C. § 271(b) by actively encouraging others to import into the United States, and/or make, use, sell, and/or offer to sell in the United States, '348 Accused Products or products containing the infringing semiconductor components of the '348 Accused Products.  For example, Xilinx actively promotes the sale, use, and importation of the '348 Accused Products in marketing materials, technical specifications, data sheets, web pages on its website (e.g., www.xilinx.com), press releases, training tutorials, development and design tools, user manuals, and developer forums as well as at trade shows (e.g., the Consumer Technology Association's Consumer Electronics Show ("CES") and Xilinx Development Forum) and through its sales and distribution channels that encourage infringing uses, sales, offers to sell, and importation of the '348 Accused Products.  As another example, Xilinx representatives travel to customer sites in the United States for sales and support activity

that includes working with customers to facilitate these customers' infringing testing, marketing, importation, and sales activity.  On information and belief, Xilinx supplies customers with '348 Accused Products so that they may be used, sold, or offered for sale by those customers.  For example, Xilinx provides direct sales to original equipment manufacturers and electronic manufacturing service providers.  On information and belief, these direct sales include sales to customers in the United States.  Certain Xilinx semiconductor components are compatible with standards specific to the United States such as Code Division Multiple Access ("CDMA") wireless standards, required primarily for compatibility with major carriers in the United States. In 2018, 2017, and 2016, Xilinx generated more net revenue from the United States than any other country.  Xilinx additionally provides a wide range of technical support to customers, including product-specific solution centers and customer forums.  Xilinx also promotes, publicly on its website, uses of the '348 Accused Products by customers in the United States.

36.     By at least August 26, 2019, Globalfoundries disclosed, by sending a letter and filing this Complaint, the existence of the '348 patent and identified at least some of Xilinx's and others' activities that infringe the '348 patent.  Thus, based on this disclosure, Xilinx had knowledge of the '348 patent and that its activities infringe the '348 patent since at least August 26, 2019.  Based on Globalfoundries' disclosures, Xilinx has also known or should have known since at least August 26, 2019 that its customers, distributors, and other purchasers of the '348 Accused Products are infringing the '348 patent at least because Xilinx has known that it is infringing the '348 patent.

37.     Other entities directly infringe the '348 patent by making, using, offering to sell, and/or selling the '348 Accused Products in the United States and by importing the '348 Accused Products into the United States.  For example, and as alleged more particularly below, Avnet,

Inc. and Mouser have infringed and continue to infringe one or more claims of the '348 patent, including at least claim 1, literally or under the doctrine of equivalents at least under 35 U.S.C. § 271(a) by importing into the United States, and/or selling, and/or offering for sale in the United States, without any authority or license, at least some '348 Accused Products.

38.      On information and belief, Mouser has infringed and continues to infringe one or more claims of the '348 patent, including at least claim 1, literally or under the doctrine of equivalents at least under 35 U.S.C. § 271(a) by importing into the United States, and/or selling, and/or offering for sale in the United States, without any authority or license, at least some '348 Accused Products.  On information and belief, Mouser imports '348 Accused Products into the United States for sales and distribution to customers located in the United States, for example, to its Texas location for shipping and distribution throughout the United States.  On information and belief, Mouser sells the '348 Accused Products in the United States.  For example, Mouser sells '348 Accused Products through its website www.mouser.com.  On information and belief, Mouser offers the '348 Accused Products for sale in the United States.  For example, Mouser engages in sales, marketing, and contracting activity in the United States and/or with United States offices of its customers.  In particular, Mouser has at least four sales branches across the United States.  Mouser also widely publicizes its distributor relationship with Xilinx, including maintaining stock of '348 Accused Products for shipping throughout the United States.

39.      Globalfoundries has suffered and continues to suffer damages as a result of Defendants' infringement of the '348 patent.

40.      Defendants' continuing acts of infringement are a basis of consumer demand for the '348 Accused Products.  Defendants' continuing acts of infringement are therefore irreparably harming and causing damage to Globalfoundries, for which Globalfoundries has no

adequate remedy at law, and will continue to suffer such irreparable injury unless Defendants' continuing acts of infringement are enjoined by the Court. The hardships that an injunction would impose are less than those faced by Globalfoundries should an injunction not issue. The public interest would be served by issuance of an injunction.

## COUNT II
## INFRINGEMENT OF THE '910 PATENT

41.     Globalfoundries incorporates by reference the allegations set forth in paragraphs 1 through 40 as though fully set forth herein.

42.     On information and belief, Xilinx has directly infringed and continues to infringe and/or has induced infringement of one or more claims of the '910 patent, including at least claim 1, literally or under the doctrine of equivalents, by importing into the United States, and/or using, and/or selling, and/or offering to sell in the United States without authority or license, integrated circuits manufactured by TSMC using, for example, TSMC's 16 Nanometer technology and products containing these integrated circuits (collectively, the "'910 Accused Products"), in violation of 35 U.S.C. § 271. The '910 Accused Products include at least field programmable gate arrays, including 3D ICs ("FPGAs"), adaptive compute acceleration platforms ("ACAPs"), and systems on a chip, including MPSoCs and RFSoCs ("SoCs"), such as the Xilinx XCKU3P and XCKU15P families of FPGAs, and other Kintex UltraScale+ FPGAs, fabricated using, for example, TSMC's 16 Nanometer process.

43.     On information and belief, Xilinx has directly infringed and continues to infringe one or more claims of the '910 patent, including at least claim 1, literally or under the doctrine of equivalents, by importing into the United States, and/or using, and/or selling, and/or offering to sell in the United States, without authority or license, '910 Accused Products, in violation of 35 U.S.C. § 271(a). On information and belief, Xilinx imports '910 Accused Products into the

United States for sales and distribution to customers located in the United States. On information and belief, Xilinx sells the '910 Accused Products in the United States. For example, Xilinx provides direct sales through at least its bare die program and sells directly to original equipment manufacturers and electronic manufacturing service providers. On information and belief, these direct sales include sales of '910 Accused Products in the United States. On information and belief, Xilinx offers the '910 Accused Products for sale in the United States. For example, Xilinx engages in sales, marketing, and contracting activity in the United States and/or with United States offices of its customers. In particular, Xilinx has sales representatives in at least 47 states and sales offices throughout the United States.

44.    The '910 Accused Products meet all the limitations of at least claim 1 of the '910 patent. Specifically, claim 1 of the '910 patent claims a semiconductor device comprising: a semiconductor substrate; a first transistor and a second transistor disposed on said substrate; each of said transistors comprising a source, a drain, and a gate; a first CB layer electrically connected to said gate of said first transistor; a second CB layer electrically connected to said gate of said second transistor; and a CA layer extending longitudinally between a first end and a second end; wherein said first CB layer is electrically connected to said first end of said CA layer; said second CB layer is electrically connected to said second end of said CA layer; said gate of said first transistor extends longitudinally along a first line and said gate of said second transistor extends longitudinally along a second line, wherein said first and second lines are generally parallel to one another and spaced apart from one another; and said CA layer extends generally parallel to said lines and generally perpendicular to said first CB layer and said second CB layer; and wherein said first CB layer extends longitudinally beyond said gate of said first transistor and/or said second CB layer extends longitudinally beyond said gate of said second transistor.

45.     The '910 Accused Products are semiconductor devices.  Each is an integrated circuit fabricated using, for example, TSMC's 16 Nanometer semiconductor process.

46.     The '910 Accused Products have a semiconductor substrate.  Each is an integrated circuit fabricated using, for example, TSMC's 16 Nanometer semiconductor process such that the circuit's structures are fabricated on top of a semiconductor substrate.

47.     The '910 Accused Products have a first transistor and a second transistor disposed on said substrate.  Each is an integrated circuit fabricated using, for example, TSMC's 16 Nanometer semiconductor process such that at least two transistors are formed on the semiconductor substrate.

48.     In the '910 Accused Products, each of the said transistors comprise a source, a drain, and a gate.  Each is an integrated circuit fabricated using, for example, TSMC's 16 Nanometer semiconductor process such that at least two transistors are formed on the substrate, where each transistor has a source, a drain, and a gate.

49.     The '910 Accused Products have a first CB layer electrically connected to said gate of said first transistor.  Each includes, for example, SRAM cells made up of multiple transistors.  The SRAM cells are fabricated with a local interconnect layer that electrically connects to the gate of a first transistor.

50.     The '910 Accused Products have a second CB layer electrically connected to said gate of said second transistor.  Each includes, for example, SRAM cells made up of multiple transistors.  The SRAM cells are fabricated with another local interconnect layer that electrically connects to the gate of a second transistor.

51.     The '910 Accused Products have a CA layer extending longitudinally between a first end and a second end; wherein said first CB layer is electrically connected to said first end

17

of said CA layer; said second CB layer is electrically connected to said second end of said CA layer. Each includes, for example, SRAM cells made up of multiple transistors. The SRAM cells are fabricated with a layer having a first end and a second end that extends longitudinally such that its ends electrically connect the first and second local interconnect layers.

52.     In the '910 Accused Products, the gate of said first transistor extends longitudinally along a first line and said gate of said second transistor extends longitudinally along a second line, wherein said first and second lines are generally parallel to one another and spaced apart from one another. Each includes, for example, SRAM cells made up of multiple transistors. The SRAM cells are fabricated such that the first and second transistors include gates that extend longitudinally along lines that are generally parallel to one another and spaced apart.

53.     In the '910 Accused Products, the CA layer extends generally parallel to said lines and generally perpendicular to said first CB layer and said second CB layer. Each includes, for example, SRAM cells made up of multiple transistors. The SRAM cells are fabricated such that a local interconnect layer is parallel to the lines on which the gates of the first and second transistors lie, and the local interconnect layer is perpendicular to the first and second local interconnect layers described in ¶¶ 49 and 50.

54.     In the '910 Accused Products, one or both of the CB layers extends longitudinally beyond the respective gates of the first and second transistors. Each includes, for example, SRAM cells made up of multiple transistors. The SRAM cells are fabricated such that the local interconnect layers described in ¶¶ 49 and 50 extend longitudinally beyond the gates of a first and/or second transistor.

55.     On information and belief, Xilinx actively, knowingly, and intentionally induces infringement of one or more claims of the '910 patent under 35 U.S.C. § 271(b) by actively encouraging others to import into the United States and/or make, use, sell and/or offer to sell in the United States, '910 Accused Products or products containing the infringing semiconductor components of the '910 Accused Products.  For example, Xilinx actively promotes the sale, use, and importation of the '910 Accused Products in marketing materials, technical specifications, data sheets, web pages on its website (e.g., www.xilinx.com), press releases, training tutorials, development and design tools, user manuals, and developer forums as well as at trade shows (e.g., the Consumer Technology Association's Consumer Electronics Show ("CES") and Xilinx Development Forum) and through its sales and distribution channels that encourage infringing uses, sales, offers to sell, and importation of the '910 Accused Products.  As another example, Xilinx representatives travel to customer sites in the United States for sales and support activity that includes working with customers to facilitate these customers' infringing testing, marketing, importation, and sales activity.  On information and belief, Xilinx supplies customers with '910 Accused Products so that they may be used, sold, or offered for sale by those customers.  For example, Xilinx provides direct sales to original equipment manufacturers and electronic manufacturing service providers.  On information and belief, these direct sales include sales to customers in the United States.  Certain Xilinx semiconductor components are compatible with standards specific to the United States such as Code Division Multiple Access ("CDMA") wireless standards, required primarily for compatibility with major carriers in the United States. In 2018, 2017, and 2016, Xilinx generated more net revenue from the United States than any other country.  Xilinx additionally provides a wide range of technical support to customers,

including product-specific solution centers and customer forums.  Xilinx also promotes, publicly

on its website, uses of the '910 Accused Products by customers in the United States.

56.     By at least August 26, 2019, Globalfoundries disclosed, by sending a letter and

filing this Complaint, the existence of the '910 patent and identified at least some of Xilinx's and

others' activities that infringe the '910 patent.  Thus, based on this disclosure, Xilinx had

knowledge of the '910 patent and that its activities infringe the '910 patent since at least August

26, 2019.  Based on Globalfoundries' disclosures, Xilinx has also known or should have known

since at least August 26, 2019 that its customers, distributors, and other purchasers of the '910

Accused Products are infringing the '910 patent at least because Xilinx has known that it is

infringing the '910 patent.

57.     Other entities directly infringe the '910 patent by making, using, offering to sell,

and/or selling the '910 Accused Products in the United States and by importing the '910 Accused

Products into the United States.  For example, and as alleged more particularly below, Avnet,

Inc. and Mouser have infringed and continue to infringe one or more claims of the '910 patent,

including at least claim 1, literally or under the doctrine of equivalents at least under 35 U.S.C. §

271(a) by importing into the United States, and/or selling, and/or offering for sale in the United

States, without any authority or license, at least some '910 Accused Products.

58.     On information and belief, Mouser has infringed and continues to infringe one or

more claims of the '910 patent, including at least claim 1, literally or under the doctrine of

equivalents at least under 35 U.S.C. § 271(a) by importing into the United States, and/or selling,

and/or offering for sale in the United States, without any authority or license, at least some '910

Accused Products.  On information and belief, Mouser imports '910 Accused Products into the

United States for sales and distribution to customers located in the United States, for example, to

its Texas location for shipping and distribution throughout the United States.  On information and belief, Mouser sells the '910 Accused Products in the United States.  For example, Mouser sells '910 Accused Products through its website www.mouser.com.  On information and belief, Mouser offers the '910 Accused Products for sale in the United States.  For example, Mouser engages in sales, marketing, and contracting activity in the United States and/or with United States offices of its customers.  In particular, Mouser has at least four sales branches across the United States.  Mouser also widely publicizes its distributor relationship with Xilinx, including maintaining stock of '910 Accused Products for shipping throughout the United States.

59.     Globalfoundries has suffered and continues to suffer damages as a result of Defendants' infringement of the '910 patent.

60.     Defendants' continuing acts of infringement are a basis of consumer demand for the '910 Accused Products.   Defendants' continuing acts of infringement are therefore irreparably harming and causing damage to Globalfoundries, for which Globalfoundries has no adequate remedy at law, and will continue to suffer such irreparable injury unless Defendants' continuing acts of infringement are enjoined by the Court.  The hardships that an injunction would impose are less than those faced by Globalfoundries should an injunction not issue.  The public interest would be served by issuance of an injunction.

## COUNT III
## INFRINGEMENT OF THE '497 PATENT

61.     Globalfoundries incorporates by reference the allegations set forth in paragraphs 1 through 60 as though fully set forth herein.

62.     On information and belief, Xilinx has directly infringed and continues to infringe and/or has induced infringement of claim 1 of the '497 patent literally or under the doctrine of equivalents, by importing into the United States, and/or using, and/or selling, and/or offering to

sell in the United States without authority or license, integrated circuits manufactured by TSMC using, for example, TSMC's 28 Nanometer or 16 Nanometer technology and products containing these integrated circuits (collectively, the "'497 Accused Products"), in violation of 35 U.S.C. § 271. The '497 Accused Products include at least field programmable gate arrays, including 3D ICs ("FPGAs"), adaptive compute acceleration platforms ("ACAPs"), and systems on a chip, including MPSoCs and RFSoCs ("SoCs"), such as the Xilinx XCKU3P and XCKU15P families of FPGAs, and other Kintex UltraScale+ FPGAs, fabricated using, for example, TSMC's 28 Nanometer or 16 Nanometer process.

63.     On information and belief, Xilinx has directly infringed and continues to infringe claim 1 of the '497 patent literally or under the doctrine of equivalents, by importing into the United States, and/or using, and/or selling, and/or offering for sale in the United States, without authority or license, '497 Accused Products, in violation of 35 U.S.C. § 271(g). On information and belief, Xilinx imports '497 Accused Products into the United States for sales and distribution to customers located in the United States. On information and belief, Xilinx sells the '497 Accused Products in the United States. For example, Xilinx provides direct sales through at least its bare die program and sells directly to original equipment manufacturers and electronic manufacturing service providers. On information and belief, these direct sales include sales of '497 Accused Products in the United States. On information and belief, Xilinx offers the '497 Accused Products for sale in the United States. For example, Xilinx engages in sales, marketing, and contracting activity in the United States and/or with United States offices of its customers. In particular, Xilinx has sales representatives in at least 47 states and sales offices throughout the United States.

64.     The '497 Accused Products are manufactured by a process including all of the limitations of claim 1 of the '497 patent.  Specifically, claim 1 of the '497 patent claims a method of changing workfunction of a conductive stack comprising: providing a material stack that comprises a Hf-based dielectric having a dielectric constant of greater than silicon dioxide, a metal-containing material including at least one metal selected from Ti, Zr, Hf, V, Nb and Ta located above said Hf-based dielectric, and a conductive electrode located above said metal-containing material; and introducing at least one workfunction altering metal impurity into said metal-containing material, wherein said at least one workfunction altering metal impurity is introduced during forming of a metal impurity containing layer or after formation of a layer containing said metal-containing material, and said introducing is selected from (i) codepositing the at least one workfunction altering metal impurity and the metal-containing material, (ii) forming a first layer of the metal-containing material, forming a layer containing the metal impurities on said first layer, and forming a second layer of the metal-containing material, and (iii) forming a material layer containing the metal impurities below and/or above the metal-containing material, and subjecting the material stack to a thermal process, and with the proviso that when an n-type workfunction is required, the at least one workfunction altering metal impurity comprises at least one element from Groups IIIB, IVB, or VB of the Periodic Table of Elements, and when a p-type workfunction is required the at least one workfunction altering metal impurity comprises at least one element from VIB, VIIB or VIII of the Periodic Table of Elements.

65.     The '497 Accused Products are made by a method of changing workfunction of a conductive stack.  TSMC's manufacture of each of the '497 Accused Products involves changing workfunction for at least some conductive stacks in the product.

23

66.     During the manufacture of the '497 Accused Products, a material stack is provided that comprises a Hf-based dielectric having a dielectric constant of greater than silicon dioxide, a metal-containing material including at least one metal selected from Ti, Zr, Hf, V, Nb and Ta located above said Hf-based dielectric, and a conductive electrode located above said metal-containing material.  TSMC's manufacture of at least one n-type FET in each of the '497 Accused Products includes creating a material stack with an Hf-based dielectric on top of a substrate.  Hf-based dielectrics are known in the art to have a dielectric constant greater than silicon dioxide.  TSMC's manufacture of at least one n-type FET in each of the '497 Accused Products includes a metal-containing material that includes titanium metal above the Hf-based dielectric.  TSMC's manufacture of at least one n-type FET in each of the '497 Products includes a conductive electrode located above the metal-containing material to form the gate of at least one n-type FET.

67.     During the manufacture of the '497 Accused Products, at least one workfunction altering metal impurity is introduced into said metal-containing material, wherein said at least one workfunction altering metal impurity is introduced during forming of a metal impurity containing layer or after formation of a layer containing said metal-containing material, and said introducing is selected from (i) codepositing the at least one workfunction altering metal impurity and the metal-containing material, (ii) forming a first layer of the metal-containing material, forming a layer containing the metal impurities on said first layer, and forming a second layer of the metal-containing material, and (iii) forming a material layer containing the metal impurities below and/or above the metal-containing material, and subjecting the material stack to a thermal process, and with the proviso that when an n-type workfunction is required, the at least one workfunction altering metal impurity comprises at least one element from Groups

IIIB, IVB, or VB of the Periodic Table of Elements, and when a p-type workfunction is required the at least one workfunction altering metal impurity comprises at least one element from VIB, VIIB or VIII of the Periodic Table of Elements.  TSMC's manufacture of at least one n-type FET in each of the '497 Accused Products includes introducing tantalum into the metal-containing material.   On information and belief, the tantalum is introduced into the metal impurity containing layer by forming a first layer of the metal-containing material (titanium), forming a layer containing the tantalum metal impurities on the first layer, and forming a second layer of the metal-containing material (titanium).  Tantalum is a Group VB metal.  By this process, the workfunction of the material stack is altered.

68.    On information and belief, the '497 Accused Products are neither materially changed by subsequent processes nor become trivial and nonessential components of another product.

69.    On information and belief, Xilinx actively, knowingly, and intentionally induces infringement of claim 1 of the '497 patent under 35 U.S.C. § 271(b) by actively encouraging others to import into the United States and/or use, sell, and/or offer to sell in the United States, '497 Accused Products.  For example, Xilinx actively promotes the sale, use, and importation of the '497 Accused Products in marketing materials, technical specifications, data sheets, web pages on its website (e.g., www.xilinx.com), press releases, training tutorials, development and design tools, user manuals, and developer forums as well as at trade shows (e.g., the Consumer Technology Association's Consumer Electronics Show ("CES") and Xilinx Development Forum) and through its sales and distribution channels that encourage infringing uses, sales, offers to sell, and importation of the '497 Accused Products.  As another example, Xilinx representatives travel to customer sites in the United States for sales and support activity that

includes working with customers to facilitate these customers' infringing testing, marketing, importation, and sales activity.  On information and belief, Xilinx supplies customers with '497 Accused Products so that they may be used, sold, or offered for sale by those customers.  For example, Xilinx provides direct sales to original equipment manufacturers and electronic manufacturing service providers.   On information and belief, these direct sales include sales to customers in the United States.  Certain Xilinx semiconductor components are compatible with standards specific to the United States such as Code Division Multiple Access ("CDMA") wireless standards, required primarily for compatibility with major carriers in the United States. In 2018, 2017, and 2016, Xilinx generated more net revenue from the United States than any other country.  Xilinx additionally provides a wide range of technical support to customers, including product-specific solution centers and customer forums.  Xilinx also promotes, publicly on its website, uses of the '497 Accused Products by customers in the United States.

70.     By at least August 26, 2019, Globalfoundries disclosed, by sending a letter and filing this Complaint, the existence of the '497 patent and identified at least some of Xilinx's and others' activities that infringe the '497 patent.   Thus, based on this disclosure, Xilinx had knowledge of the '497 patent and that its activities infringe the '497 patent since at least August 26, 2019.  Based on Globalfoundries' disclosures, Xilinx has also known or should have known since at least August 26, 2019 that its customers, distributors, and other purchasers of the '497 Accused Products are infringing the '497 patent at least because Xilinx has known that it is infringing the '497 patent.

71.     Other entities directly infringe the '497 patent by using, offering to sell, and/or selling the '497 Accused Products in the United States and by importing the '497 Accused Products into the United States.  For example, and as alleged more particularly below, Avnet,

Inc. and Mouser have infringed and continue to infringe claim 1 of the '497 patent literally or under the doctrine of equivalents at least under 35 U.S.C. § 271(g) by importing into the United States, and/or selling, and/or offering for sale in the United States, without any authority or license, at least some '497 Accused Products.

72.     On information and belief, Mouser has infringed and continues to infringe claim 1 of the '497 patent literally or under the doctrine of equivalents at least under 35 U.S.C. § 271(g) by importing into the United States, and/or selling, and/or offering for sale in the United States, without any authority or license, at least some '497 Accused Products.   On information and belief, Mouser imports '497 Accused Products into the United States for sales and distribution to customers located in the United States, for example to its Texas location for shipping and distribution throughout the United States.   On information and belief, Mouser sells the '497 Accused Products in the United States.   For example, Mouser sells '497 Accused Products through its website www.mouser.com.   On information and belief, Mouser offers the '497 Accused Products for sale in the United States.   For example, Mouser engages in sales, marketing, and contracting activity in the United States and/or with United States offices of its customers.   In particular, Mouser has at least four sales branches across the United States. Mouser also widely publicizes its distributor relationship with Xilinx, including maintaining stock of '497 Accused Products for shipping throughout the United States.

73.     Globalfoundries has suffered and continues to suffer damages as a result of Defendants' infringement of the '497 patent.

74.     Defendants' continuing acts of infringement are a basis of consumer demand for the '497 Accused Products.   Defendants' continuing acts of infringement are therefore irreparably harming and causing damage to Globalfoundries, for which Globalfoundries has no

adequate remedy at law, and will continue to suffer such irreparable injury unless Defendants' continuing acts of infringement are enjoined by the Court.  The hardships that an injunction would impose are less than those faced by Globalfoundries should an injunction not issue.  The public interest would be served by issuance of an injunction.

## COUNT IV
## INFRINGEMENT OF THE '633 PATENT

75.     Globalfoundries incorporates by reference the allegations set forth in paragraphs 1 through 74 as though fully set forth herein.

76.     On information and belief, Xilinx has directly infringed and continues to infringe and/or has induced infringement of one or more claims of the '633 patent, including at least claim 1, literally or under the doctrine of equivalents, by importing into the United States, and/or using, and/or selling, and/or offering to sell in the United States without authority or license, integrated circuits manufactured by TSMC using, for example, TSMC's 16 Nanometer technology and products containing these integrated circuits (collectively, the "'633 Accused Products"), in violation of 35 U.S.C. § 271.  The '633 Accused Products include at least field programmable gate arrays, including 3D ICs ("FPGAs"), adaptive compute acceleration platforms ("ACAPs"), and systems on a chip, including MPSoCs and RFSoCs ("SoCs"), such as the Xilinx XCKU3P and XCKU15P families of FPGAs, and other Kintex UltraScale+ FPGAs, fabricated using, for example, TSMC's 16 Nanometer process.

77.     On information and belief, Xilinx has directly infringed and continues to infringe one or more claims of the '633 patent, including at least claim 1, literally or under the doctrine of equivalents, by importing into the United States, and/or using, and/or selling, and/or offering to sell in the United States, without authority or license, '633 Accused Products, in violation of 35 U.S.C. § 271(a).  On information and belief, Xilinx imports '633 Accused Products into the

United States for sales and distribution to customers located in the United States.   On information and belief, Xilinx sells the '633 Accused Products in the United States.   For example, Xilinx provides direct sales through at least its bare die program and sells directly to original equipment manufacturers and electronic manufacturing service providers.   On information and belief, these direct sales include sales of '633 Accused Products in the United States.  On information and belief, Xilinx offers the '633 Accused Products for sale in the United States.  For example, Xilinx engages in sales, marketing, and contracting activity in the United States and/or with United States offices of its customers.   In particular, Xilinx has sales representatives in at least 47 states and sales offices throughout the United States.

78.     The '633 Accused Products meet all the limitations of at least claim 1 of the '633 patent.  Specifically, claim 1 of the '633 patent claims a semiconductor device comprising: a semiconductor substrate having a diffusion region; a transistor formed within said diffusion region and comprising a source, a drain, and a gate; a metal layer including a power rail disposed outside said diffusion region and a pin layer extending from said diffusion region to outside said diffusion region; a contact layer disposed above said substrate and below said metal layer; and a via disposed between said contact layer and said power rail to electrically connect said contact layer to said power rail; and wherein said contact layer includes a first length disposed outside said diffusion region and a second length extending from said first length into said diffusion region and electrically connected to said transistor.

79.     The '633 Accused Products are semiconductor devices.  Each is an integrated circuit fabricated using, for example, TSMC's 16 Nanometer semiconductor process.

80.     The '633 Accused Products have a semiconductor substrate having a diffusion region.  Each is an integrated circuit fabricated using, for example, TSMC's 16 Nanometer

semiconductor process such that the circuit's structures are fabricated on top of a semiconductor substrate.  The substrate of each has a diffusion region.

81.     The '633 Accused Products have a transistor formed within the diffusion region and comprising a source, a drain, and a gate.  Each is an integrated circuit fabricated using, for example, TSMC's 16 Nanometer semiconductor process such that each has a transistor formed within the diffusion region of the substrate, where each transistor has a source, a drain, and a gate.

82.     The '633 Accused Products have a metal layer including a power rail disposed outside said diffusion region and a pin layer extending from said diffusion region to outside said diffusion region. Each is an integrated circuit fabricated using, for example, TSMC's 16 Nanometer semiconductor process such that each has a metal layer including a power rail, where the power rail is disposed outside the diffusion region.  Each has a pin layer extending from the diffusion region to outside the diffusion region.  For example, in integrated circuits including a GPU, a power rail is formed outside the diffusion region at the M1 level, and a pin layer is formed extending both inside and outside the diffusion region.

83.     The '633 Accused Products have a contact layer disposed above said substrate and below said metal layer; and a via disposed between said contact layer and said power rail to electrically connect said contact layer to said power rail.  Each is an integrated circuit fabricated using, for example, TSMC's 16 Nanometer semiconductor process such that each has a contact layer disposed above the substrate and below the metal layer.  Each has a via between the contact layer and the power rail.  The via connects the contact layer to the power rail.  For example, in integrated circuits including a GPU, a contact layer is formed below the M1 level, and at least

one via is disposed between the contact layer and the power rail such that the two are electrically connected.

84.    In the '633 Accused Products said contact layer includes a first length disposed outside said diffusion region and a second length extending from said first length into said diffusion region and electrically connected to said transistor.  The contact layer has a first length disposed outside the diffusion region.  The contact layer includes a second length extending from the first length into the diffusion region.  At least some of the second lengths are electrically connected to at least some of the transistors.  For example, in integrated circuits including a GPU, the contact layer is formed such that it extends from outside the diffusion region to inside the diffusion region and electrically connects to at least some transistors.

85.    On information and belief, Xilinx actively, knowingly, and intentionally induces infringement of one or more claims of the '633 patent under 35 U.S.C. § 271(b) by actively encouraging others to import into the United States and/or make, use, sell, and/or offer to sell in the United States, '633 Accused Products or products containing the infringing semiconductor components of the '633 Accused Products.  For example, Xilinx actively promotes the sale, use, and importation of the '633 Accused Products in marketing materials, technical specifications, data sheets, web pages on its website (e.g., www.xilinx.com), press releases, training tutorials, development and design tools, user manuals, and developer forums as well as at trade shows (e.g., the Consumer Technology Association's Consumer Electronics Show ("CES") and Xilinx Development Forum) and through its sales and distribution channels that encourage infringing uses, sales, offers to sell, and importation of the '633 Accused Products.  As another example, Xilinx representatives travel to customer sites in the United States for sales and support activity that includes working with customers to facilitate these customers' infringing testing, marketing,

importation, and sales activity.  On information and belief, Xilinx supplies customers with '633 Accused Products so that they may be used, sold, or offered for sale by those customers.  For example, Xilinx provides direct sales to original equipment manufacturers and electronic manufacturing service providers.  On information and belief, these direct sales include sales to customers in the United States.  Certain Xilinx semiconductor components are compatible with standards specific to the United States such as Code Division Multiple Access ("CDMA") wireless standards, required primarily for compatibility with major carriers in the United States.  In 2018, 2017, and 2016, Xilinx generated more net revenue from the United States than any other country.  Xilinx additionally provides a wide range of technical support to customers, including product-specific solution centers and customer forums.  Xilinx also promotes, publicly on its website, uses of the '633 Accused Products by customers in the United States.

86.     By at least August 26, 2019, Globalfoundries disclosed, by sending a letter and filing this Complaint, the existence of the '633 patent and identified at least some of Xilinx's and others' activities that infringe the '633 patent.  Thus, based on this disclosure, Xilinx had knowledge of the '633 patent and that its activities infringe the '633 patent since at least August 26, 2019.  Based on Globalfoundries' disclosures, Xilinx has also known or should have known since at least August 26, 2019 that its customers, distributors, and other purchasers of the '633 Accused Products are infringing the '633 patent at least because Xilinx has known that it is infringing the '633 patent.

87.     Other entities directly infringe the '633 patent by making, using, offering to sell, and/or selling the '633 Accused Products in the United States and by importing the '633 Accused Products into the United States.  For example, and as alleged more particularly below, Avnet, Inc. and Mouser have infringed and continue to infringe one or more claims of the '633 patent,

including at least claim 1, literally or under the doctrine of equivalents at least under 35 U.S.C. § 271(a) by importing into the United States, and/or selling, and/or offering for sale in the United States, without any authority or license, at least some '633 Accused Products.

88.    On information and belief, Mouser has infringed and continues to infringe one or more claims of the '633 patent, including at least claim 1, literally or under the doctrine of equivalents at least under 35 U.S.C. § 271(a) by importing into the United States, and/or selling, and/or offering for sale in the United States, without any authority or license, at least some '633 Accused Products.  On information and belief, Mouser imports '633 Accused Products into the United States for sales and distribution to customers located in the United States, for example to its Texas location for shipping and distribution throughout the United States.  On information and belief, Mouser sells the '633 Accused Products in the United States.  For example, Mouser sells '633 Accused Products through its website www.mouser.com.  On information and belief, Mouser offers the '633 Accused Products for sale in the United States.  For example, Mouser engages in sales, marketing, and contracting activity in the United States and/or with United States offices of its customers.  In particular, Mouser has at least four sales branches across the United States.  Mouser also widely publicizes its distributor relationship with Xilinx, including maintaining stock of '633 Accused Products for shipping throughout the United States.

89.    Globalfoundries has suffered and continues to suffer damages as a result of Defendants' infringement of the '633 patent.

90.    Defendants' continuing acts of infringement are a basis of consumer demand for the '633 Accused Products.  Defendants' continuing acts of infringement are therefore irreparably harming and causing damage to Globalfoundries, for which Globalfoundries has no adequate remedy at law, and will continue to suffer such irreparable injury unless Defendants'

continuing acts of infringement are enjoined by the Court. The hardships that an injunction would impose are less than those faced by Globalfoundries should an injunction not issue. The public interest would be served by issuance of an injunction.

### COUNT V
### INFRINGEMENT OF THE '167 PATENT

91. Globalfoundries incorporates by reference the allegations set forth in paragraphs 1 through 90 as though fully set forth herein.

92. On information and belief, Xilinx has directly infringed and continues to infringe and/or has induced infringement of one or more claims of the '167 patent, including at least claim 1, literally or under the doctrine of equivalents, by importing into the United States, and/or using, and/or selling, and/or offering to sell in the United States without authority or license, integrated circuits manufactured by TSMC using, for example, TSMC's 16 Nanometer technology and products containing these integrated circuits (collectively, the "'167 Accused Products"), in violation of 35 U.S.C. § 271. The '167 Accused Products include at least field programmable gate arrays, including 3D ICs ("FPGAs"), adaptive compute acceleration platforms ("ACAPs"), and systems on a chip, including MPSoCs and RFSoCs ("SoCs"), such as the Xilinx XCKU3P and XCKU15P families of FPGAs, and other Kintex UltraScale+ FPGAs, fabricated using, for example, TSMC's 16 Nanometer process.

93. On information and belief, Xilinx has directly infringed and continues to infringe at least claim 1 of the '167 patent literally or under the doctrine of equivalents, by importing into the United States, and/or using, and/or selling, and/or offering for sale in the United States, without authority or license, '167 Accused Products, in violation of 35 U.S.C. § 271(g). On information and belief, Xilinx imports '167 Accused Products into the United States for sales and distribution to customers located in the United States. On information and belief, Xilinx

sells the '167 Accused Products in the United States.  For example, Xilinx provides direct sales through at least its bare die program and sells directly to original equipment manufacturers and electronic manufacturing service providers.  On information and belief, these direct sales include sales of '167 Accused Products in the United States.  On information and belief, Xilinx offers the '167 Accused Products for sale in the United States.  For example, Xilinx engages in sales, marketing, and contracting activity in the United States and/or with United States offices of its customers.  In particular, Xilinx has sales representatives in at least 47 states and sales offices throughout the United States.

94.     The '167 Accused Products are manufactured by a process including all of the limitations of at least claim 1 of the '167 patent.  Specifically, claim 1 of the '167 patent claims a method of forming a metal layer interface between a copper layer and a silicon nitride layer, the method comprising: providing a metal organic gas over a copper layer; forming a metal layer from reactions between the metal organic gas and the copper layer; and depositing a silicon nitride layer over the metal layer and copper layer, the metal layer providing an interface adhesion between the silicon nitride layer and the copper layer.

95.     The '167 Accused Products are made by a method of forming a metal layer interface between a copper layer and a silicon nitride layer.  TSMC's manufacture of the '167 Accused Products results in a metal layer interface.  The metal layer interface is between a copper layer and a silicon nitride layer.  On information and belief, TSMC uses a selective CVD cobalt process to perform this method.

96.     During the manufacture of the '167 Accused Products a metal organic gas is provided over a copper layer.  TSMC's manufacture of the '167 Accused Products provides a

metal organic gas over a copper layer.  On information and belief, TSMC uses a selective CVD cobalt process to perform this method.

97.     During the manufacture of the '167 Accused Products, a metal layer is formed from reactions between the metal organic gas and the copper layer.  TSMC's manufacture of the '167 Accused Products forms a cobalt metal layer from reactions between the metal organic gas and the copper layer.  On information and belief, TSMC uses a selective CVD cobalt process to perform this method.

98.     During the manufacture of the '167 Accused Products, a silicon nitride layer is deposited over the metal layer and the copper layer.  TSMC's manufacture of the '167 Accused Products deposits a silicon nitride layer over the metal layer and the copper layer.  On information and belief, TSMC uses a selective CVD cobalt process to perform this method.

99.     During the manufacture of the '167 Accused Products, the metal layer provides an interface adhesion between the silicon nitride layer and the copper layer.  TSMC's manufacture of the '167 Accused Products provides an interface adhesion between the silicon nitride layer and the copper layer.  On information and belief, TSMC uses a selective CVD cobalt process to perform this method.

100.    On information and belief, the '167 Accused Products are neither materially changed by subsequent processes nor become trivial and nonessential components of another product.

101.    On information and belief, Xilinx actively, knowingly, and intentionally induces infringement of one or more claims of the '167 patent under 35 U.S.C. § 271(b) by actively encouraging others to import into the United States and/or use, sell, and/or offer to sell in the United States, '167 Accused Products.  For example, Xilinx actively promotes the sale, use, and

importation of the '167 Accused Products in marketing materials, technical specifications, data sheets, web pages on its website (e.g., www.xilinx.com), press releases, training tutorials, development and design tools, user manuals, and developer forums as well as at trade shows (e.g., the Consumer Technology Association's Consumer Electronics Show ("CES") and Xilinx Development Forum) and through its sales and distribution channels that encourage infringing uses, sales, offers to sell, and importation of the '167 Accused Products.  As another example, Xilinx representatives travel to customer sites in the United States for sales and support activity that includes working with customers to facilitate these customers' infringing testing, marketing, importation, and sales activity.  On information and belief, Xilinx supplies customers with '167 Accused Products so that they may be used, sold, or offered for sale by those customers.  For example, Xilinx provides direct sales to original equipment manufacturers and electronic manufacturing service providers.  On information and belief, these direct sales include sales to customers in the United States.  Certain Xilinx semiconductor components are compatible with standards specific to the United States such as Code Division Multiple Access ("CDMA") wireless standards, required primarily for compatibility with major carriers in the United States. In 2018, 2017, and 2016, Xilinx generated more net revenue from the United States than any other country.  Xilinx additionally provides a wide range of technical support to customers, including product-specific solution centers and customer forums.  Xilinx also promotes, publicly on its website, uses of the '167 Accused Products by customers in the United States.

102.    By at least August 26, 2019, Globalfoundries disclosed, by sending a letter and filing this Complaint, the existence of the '167 patent and identified at least some of Xilinx's and others' activities that infringe the '167 patent.  Thus, based on this disclosure, Xilinx had knowledge of the '167 patent and that its activities infringe the '167 patent since at least August

26, 2019.  Based on Globalfoundries' disclosures, Xilinx has also known or should have known since at least August 26, 2019 that its customers, distributors, and other purchasers of the '167 Accused Products are infringing the '167 patent at least because Xilinx has known that it is infringing the '167 patent.

103.    Other entities directly infringe the '167 patent by using, offering to sell, and/or selling the '167 Accused Products in the United States and by importing the '167 Accused Products into the United States.  For example, and as alleged more particularly below, Avnet, Inc. and Mouser have infringed and continue to infringe one or more claims of the '167 patent, including claim 1, literally or under the doctrine of equivalents at least under 35 U.S.C. § 271(g) by importing into the United States, and/or selling, and/or offering for sale in the United States, without any authority or license, at least some '167 Accused Products.

104.    On information and belief, Mouser has infringed and continues to infringe one or more claims of the '167 patent, including claim 1, literally or under the doctrine of equivalents at least under 35 U.S.C. § 271(g) by importing into the United States, and/or selling, and/or offering for sale in the United States, without any authority or license, at least some '167 Accused Products.  On information and belief, Mouser imports '167 Accused Products into the United States for sales and distribution to customers located in the United States, for example to its Texas location for shipping and distribution throughout the United States.  On information and belief, Mouser sells the '167 Accused Products in the United States.  For example, Mouser sells '167 Accused Products through its website www.mouser.com.  On information and belief, Mouser offers the '167 Accused Products for sale in the United States.  For example, Mouser engages in sales, marketing, and contracting activity in the United States and/or with United States offices of its customers.  In particular, Mouser has at least four sales branches across the

United States.  Mouser also widely publicizes its distributor relationship with Xilinx, including maintaining stock of '167 Accused Products for shipping throughout the United States.

105.    Globalfoundries has suffered and continues to suffer damages as a result of Defendants' infringement of the '167 patent.

106.    Defendants' continuing acts of infringement are a basis of consumer demand for the '167 Accused Products.  Defendants' continuing acts of infringement are therefore irreparably harming and causing damage to Globalfoundries, for which Globalfoundries has no adequate remedy at law, and will continue to suffer such irreparable injury unless Defendants' continuing acts of infringement are enjoined by the Court.  The hardships that an injunction would impose are less than those faced by Globalfoundries should an injunction not issue.  The public interest would be served by issuance of an injunction.

## COUNT VI
## INFRINGEMENT OF THE '966 PATENT

107.    Globalfoundries incorporates by reference the allegations set forth in paragraphs 1 through 106 as though fully set forth herein.

108.    On information and belief, Xilinx has directly infringed and continues to infringe and/or has induced infringement of one or more claims of the '966 patent, including at least claim 12, literally or under the doctrine of equivalents, by importing into the United States, and/or using, and/or selling, and/or offering to sell in the United States without authority or license, integrated circuits manufactured by TSMC using, for example, TSMC's 16 Nanometer technology and products containing these integrated circuits (collectively, the "'966 Accused Products"), in violation of 35 U.S.C. § 271.  The '966 Accused Products include at least field programmable gate arrays, including 3D ICs ("FPGAs"), adaptive compute acceleration platforms ("ACAPs"), and systems on a chip, including MPSoCs and RFSoCs ("SoCs"), such as

the Xilinx XCKU3P and XCKU15P families of FPGAs, and other Kintex UltraScale+ FPGAs, fabricated using, for example, TSMC's 16 Nanometer process.

109.    On information and belief, Xilinx has directly infringed and continues to infringe one or more claims of the '966 patent, including at least claim 12, literally or under the doctrine of equivalents, by importing into the United States, and/or using, and/or selling, and/or offering to sell in the United States, without authority or license, '966 Accused Products, in violation of 35 U.S.C. § 271(a) and (g).  On information and belief, Xilinx imports '966 Accused Products into the United States for sales and distribution to customers located in the United States.  On information and belief, Xilinx sells the '966 Accused Products in the United States.  For example, Xilinx provides direct sales through at least its bare die program and sells directly to original equipment manufacturers and electronic manufacturing service providers.  On information and belief, these direct sales include sales of '966 Accused Products in the United States.  On information and belief, Xilinx offers the '966 Accused Products for sale in the United States.  For example, Xilinx engages in sales, marketing, and contracting activity in the United States and/or with United States offices of its customers.   In particular, Xilinx has sales representatives in at least 47 states and sales offices throughout the United States.

110.    The '966 Accused Products meet all the limitations of at least claim 12 of the '966 patent.  Specifically, claim 12 of the '966 patent claims a structure, comprising: a wire embedded in a dielectric layer on a semiconductor substrate, said wire comprising a copper core and an electrically conductive liner on sidewalls and a bottom of said copper core, said copper core and said electrically conductive liner exposed at a top surface of said dielectric layer; a metal cap on an entire top surface of said copper core; a dielectric cap only over (i) said metal

cap, (ii) any exposed portions of said liner, and (iii) on said top surface of said dielectric layer; and wherein an interface between said copper core and said metal layer does not contain oxygen.

111.    The '966 Accused Products are structures.  Each is an integrated circuit fabricated using, for example, TSMC's 16 Nanometer semiconductor process.

112.    The '966 Accused Products have a wire embedded on a dielectric layer on a semiconductor substrate.  Each is an integrated circuit fabricated using, for example, TSMC's 16 Nanometer semiconductor process such that there is a dielectric layer on a semiconductor substrate.  For example, at least some of the '966 Accused Products have a SiOC dielectric layer on a semiconductor substrate.  The '966 Accused Products have a wire embedded in the dielectric layer as part of, for example, the M1-M3 interconnects.

113.    The '966 Accused Products have a wire that has a copper core and an electrically conductive liner on sidewalls and a bottom of said copper core.  Each contains wires with copper cores, for example as part of the M1-M3 interconnects.  At least some of those wires have an electrically conductive liner including, for example, tantalum and cobalt, on the sidewalls and bottom of the copper core.  Tantalum and cobalt are electrically conductive.

114.    The '966 Accused Products have a wire that has a copper core and an electrically conductive liner exposed at the top surface of said dielectric layer.  In the '966 Accused Products, in at least some instances, the copper core, electrically conductive liner including cobalt and tantalum are exposed at the top surface of the dielectric layer of, for example, at least one of the M1-M3 interconnect layers.

115.    The '966 Accused Products have a metal cap on an entire top surface of said copper core.  In the '966 Accused Products, at least some the wires have a cobalt cap on the entire top surface of the copper core.  Cobalt is a metal.

116.    The '966 Accused Products have a dielectric cap only over said metal cap, any exposed portions of said liner, and on said top surface of said dielectric layer.   In the '966 Accused Products at least some of the wires have, for example, a SiNC dielectric cap that covers only the cobalt metal cap, any exposed portions of the conductive liner, and the top surface of the SiOC dielectric layer.

117.    The '966 Accused Products have a structure wherein an interface between said copper core and said metal layer does not contain oxygen.   In the '966 Accused Products, the interface between the copper core and the cobalt cap of at least some of the wires contains no oxygen.

118.    On information and belief, the '966 Accused Products are neither materially changed by subsequent processes nor become trivial and nonessential components of another product.

119.    On information and belief, Xilinx actively, knowingly, and intentionally induces infringement of one or more claims of the '966 patent under 35 U.S.C. § 271(b) by actively encouraging others to import into the United States and/or make, use, sell, and/or offer to sell in the United States, '966 Accused Products or products containing the infringing semiconductor components of the '966  Accused Products.  For example, Xilinx actively promotes the sale, use, and importation of the '966 Accused Products in marketing materials, technical specifications, data sheets, web pages on its website (e.g., www.xilinx.com), press releases, training tutorials, development and design tools, user manuals, and developer forums as well as at trade shows (e.g., the Consumer Technology Association's Consumer Electronics Show ("CES") and Xilinx Development Forum) and through its sales and distribution channels that encourage infringing uses, sales, offers to sell, and importation of the '966 Accused Products.  As another example,

Xilinx representatives travel to customer sites in the United States for sales and support activity that includes working with customers to facilitate these customers' infringing testing, marketing, importation, and sales activity.  On information and belief, Xilinx supplies customers with '966 Accused Products so that they may be used, sold, or offered for sale by those customers.  For example, Xilinx provides direct sales to original equipment manufacturers and electronic manufacturing service providers.  On information and belief, these direct sales include sales to customers in the United States.  Certain Xilinx semiconductor components are compatible with standards specific to the United States such as Code Division Multiple Access ("CDMA") wireless standards, required primarily for compatibility with major carriers in the United States. In 2018, 2017, and 2016, Xilinx generated more net revenue from the United States than any other country.  Xilinx additionally provides a wide range of technical support to customers, including product-specific solution centers and customer forums.  Xilinx also promotes, publicly on its website, uses of the '966 Accused Products by customers in the United States.

120.    By at least August 26, 2019, Globalfoundries disclosed, by sending a letter and filing this Complaint, the existence of the '966 patent and identified at least some of Xilinx's and others' activities that infringe the '966 patent.  Thus, based on this disclosure, Xilinx had knowledge of the '966 patent and that its activities infringe the '966 patent since at least August 26, 2019.  Based on Globalfoundries' disclosures, Xilinx has also known or should have known since at least August 26, 2019 that its customers, distributors, and other purchasers of the '966 Accused Products are infringing the '966 patent at least because Xilinx has known that it is infringing the '966 patent.

121.    Other entities directly infringe the '966 patent by making, using, offering to sell, and/or selling the '966 Accused Products in the United States and by importing the '966 Accused

43

Products into the United States.  For example, and as alleged more particularly below, Avnet, Inc. and Mouser have infringed and continue to infringe one or more claims of the '966 patent, including at least claim 12, literally or under the doctrine of equivalents at least under 35 U.S.C. § 271(a) and (g) by importing into the United States, and/or selling, and/or offering for sale in the United States, without any authority or license, at least some '966 Accused Products.

122.    On information and belief, Mouser has infringed and continues to infringe one or more claims of the '966 patent, including at least claim 12, literally or under the doctrine of equivalents at least under 35 U.S.C. § 271(a) and (g) by importing into the United States, and/or selling, and/or offering for sale in the United States, without any authority or license, at least some '966 Accused Products.  On information and belief, Mouser imports '966 Accused Products into the United States for sales and distribution to customers located in the United States, for example to its Texas location for shipping and distribution throughout the United States.  On information and belief, Mouser sells the '966 Accused Products in the United States. For example, Mouser sells '966 Accused Products through its website www.mouser.com.  On information and belief, Mouser offers the '966 Accused Products for sale in the United States. For example, Mouser engages in sales, marketing, and contracting activity in the United States and/or with United States offices of its customers.  In particular, Mouser has at least four sales branches across the United States.  Mouser also widely publicizes its distributor relationship with Xilinx, including maintaining stock of '966 Accused Products for shipping throughout the United States.

123.    Globalfoundries has suffered and continues to suffer damages as a result of Defendants' infringement of the '966 patent.

124.     Defendants' continuing acts of infringement are a basis of consumer demand for the '966 Accused Products.   Defendants' continuing acts of infringement are therefore irreparably harming and causing damage to Globalfoundries, for which Globalfoundries has no adequate remedy at law, and will continue to suffer such irreparable injury unless Defendants' continuing acts of infringement are enjoined by the Court.   The hardships that an injunction would impose are less than those faced by Globalfoundries should an injunction not issue.   The public interest would be served by issuance of an injunction.

### JURY DEMAND

125.     Plaintiff demands a jury trial as to all issues that are triable by a jury in this action.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for relief as follows:

(a)     Judgment that Defendants are liable for infringement and/or inducing the infringement of one or more claims of each of the Asserted Patents;

(b)     An Order permanently enjoining Defendants and their respective officers, agents, employees, and those acting in privity or in active concert or participation with them, from further infringement of the Asserted Patents;

(c)     Compensatory damages in an amount according to proof, including lost profits, and in any event no less than a reasonable royalty;

(d)     Pre-judgment interest;

(e)     Post-judgment interest;

(f)     Attorneys' fees based on this being an exceptional case pursuant to 35 U.S.C. § 285, including pre-judgment interest on such fees;

(g)     An accounting and/or supplemental damages for all damages occurring after any discovery cutoff and through final judgment;

(h)     Costs and expenses in this action; and

(i)     Any further relief that the Court deems just and proper.


Dated:  August 26, 2019                    Respectfully submitted,

                                           FARNAN LLP

                                           /s/ Brian E. Farnan
                                           Brian E. Farnan (Bar No. 4089)
                                           Michael J. Farnan (Bar No. 5165)
                                           919 N. Market Street, 12th Street
                                           Wilmington, Delaware 19801
                                           Telephone:  (302) 777-0300
                                           Facsimile:   (302) 777-0301
                                           bfarnan@farnanlaw.com
                                           mfarnan@farnanlaw.com

                                           *Attorneys for Plaintiff Globalfoundries U.S.
                                           Inc.*